to the calendar. The first case is Kim-Chee LLC v. Philadelphia Indemnity. Good morning, your honors. May it please the court. My name is Chris Burlos and I represent the Plaintiff-Insured in the matter before you. This matter presents an issue that is faced by thousands of business owners across the country. Whether the presence of the COVID-19 virus at constitutes direct physical loss of that property so as to be afforded insurance coverage under a property casualty policy. The district court erred in granting the defendant's motion to dismiss for three main reasons. First, it engaged in an improper fact-finding determination that the presence of COVID-19 at property does not and cannot cause direct physical loss. Second, in doing so it engaged in an improper contractual analysis of the direct physical loss clause including disregarding a virus exclusion that has been widely available in the industry for over 15 years. Not only has it been widely available, it is known to the defendant and the defendant actually issued it to other policyholders but did not issue it to the plaintiff in this case. And third, the court disregarded over 50 years of case law. I just want to interrupt on the virus exception. Do you believe you paid less for your insurance because or you didn't have that coverage or more for it? Yes, your honor. Those are in the allegations. We believe that there were additional premiums included for those policyholders that did not have the virus exclusion. Did you choose not to have it included or was it just handed to you in a form? Your honor, we believe that this was something that was decided on a case-by-case basis and we believe that the if this matter proceeds to discovery that discovery will demonstrate that fact. Okay, thank you. Go on. Let's talk about your first point that you say there was fact-finding but what direct physical loss or damage to property did you allege? You have to you can't just conclusively state we had a direct physical loss. What what is what was it? Your honor, it is the presence of the virus at the property that is direct physical loss in this case and we have alleged that the the virus was present. Why can't a district court say that's implausible? That's that's not what the words mean. You don't have to engage in any fact-finding if that's your theory. You can decide that on a motion to dismiss without fact-finding, right? Your honor, I disagree that it's not fact-finding because the there is scientific evidence demonstrating that this does constitute direct physical loss. This does constitute direct physical damage in this case and so in what way? The the fact that it can't be merely cleaned by Lysol, the fact that it does in fact enter into surfaces differently, whether it's a porous surface, whether it's a hard surface, but all of that information, your honor, is scientific analysis and scientific testimony that would have to be elicited through discovery and at this point we contend that the allegations in the complaint are sufficient to get to that stage because we have alleged that the virus is present at the property. But the court accepted that allegation as true and said the presence of the virus, even if it's all over the property, is not physical damage because it as described in the opinion and why is that conclusion? He's making a legal assessment about what damage to physical property means. Well, your honor, it's a fact-finding determination that it can't cause damage but we also contend that it doesn't matter whether it causes damage. It constitutes at the very least direct physical loss of or damage to property as evidenced by 50 of analogous case law where other analogous contaminants were deemed to cause direct physical loss or direct physical damage under the same direct physical loss clause. That includes E. coli, ammonia, asbestos, all of these related contaminants were deemed over the past 50 years to be covered losses under the same language. Only now that this is a widespread... How can you compare asbestos where if you have asbestos, you have to remove it, it causes all kinds of damage to the property itself. You can't compare that to a virus that does... I know you're saying it may have gotten into the various items of furniture and things like that, but you can't compare that to asbestos. Your honor, I disagree in the sense that there's still remediation that's required and remediation in and of itself is a measure of damages, not whether a covered cause of loss occurred in the first place. And I'd like to give you an example in that point if that's okay. Sure. We can all agree that water loss, absent an exclusion, is covered under the policy. Let's take a warehouse with concrete floors. If a flood occurs absent an exclusion, that's going to be covered under the policy. But if it all dries up and there's no property damage whatsoever, the warehouse is still entitled to business interruption coverage because a covered cause of loss occurred. The property damage claim may be zero, but the business interruption claim still has value because a covered loss occurred. That's the same here. Regardless of whether the virus can be remediated and how it is remediated, that's a question of damages. But the fiberglass hurts the property. I'm sorry? And this virus does not, allegedly. Well... Doesn't it hurt the property so that you can't use it? Your honor, that is what the scientific data is showing now, is that it can harm the property. That being said, again, that's just reading it in terms of direct physical damage to property, not reading it in terms of direct physical loss. We contend that both are the case, but at the very least, that phrase in its entirety is ambiguous and should be read in the favor of the policyholder. Can you point to an analogous COVID-19 case for the fiberglass decided under New York law that comes out in your favor? Decided under New York law? New York law, because that's where we are. Your honor, not at this time, but we believe that this is the time to make that decision because... In fact, by my account, the district court cited nine, but I think there are now 20 district court cases in this circuit applying New York law who have unanimously concluded otherwise, including some lower court New York cases, right? Your honor, that is correct. However, we believe that those decisions are distinguishable because they don't take into consideration the absence of the virus exclusion and the impact that has on the ambiguity of the direct physical loss clause. The courts are taking a policy issued with a virus exclusion and a policy issued without that same virus exclusion and treating them the same exact way. That's impermissible under New York law. That's a court of appeals decision, quadrant-structured. You have to look at terms of the similar policies when examining ambiguity, and that's also this Court's decisional case law in parks, real estate, and also in international multifoods. Counsel, did you have loss interruption as one of the grounds for coverage in your policy? Loss of business interruption? Yes, your honor. And that was rejected because there was no loss to the physical building. Is that correct? That's correct. The argument is that it has to be predicated by, quote, a direct physical loss or direct physical damage. And that's New York law, right? And contract language. That's contract language, yes, your honor. However, the New York law states, and this Court has held, that in determining the ambiguity of that clause, you have to examine it in context of industry practice and standards. That's the parks, real estate case, your honor. And the fact that – I see I'm almost out of time. Can I please continue? No, you have to continue. Finish the answer. So the parks, real estate matter expressly states that you have to take into consideration the customs and practices because we want uniformity in the insurance industry. So that's why I asked you, process and practices. You can't point to a case in New York that decided as you would like this case to come out. We cannot point to a case that has ruled in our favor in terms of COVID. But pre-COVID, the defense is hard-pressed to find a case that hasn't come out that analogous contaminants are covered under this same clause. And so we look at the fact that the insurance industry developed the virus exclusion, and then the defendants used it for some policyholders and not others. That's – Can I just follow up on this point? You cite this litany of cases in which there was no structural damage. Instead, we're talking about asbestos getting into the property, seepage of gasoline, et cetera. And Judge Bianco said, well, maybe those cases are distinguishable in that even though the asbestos didn't damage the physical structure itself, it requires damage to the physical structure to remediate it, right? You've got to start ripping pipes out or whatever it is. Do any of these cases that you cite explicitly acknowledge as a factual matter that there was not only no damage to the physical structure, but also no remediation required? In other words, all you have to do is wait a few days and the conditions will dissipate. Your Honor, in regards to whether they directly address that point, not specifically, but I would disagree with the last thing Your Honor stated, that if we just wait a few days, that everything will dissipate. Because we don't know that. The science is still developed on that, and there's conflicting science on that point. So again, that goes back to the fact that we don't know exactly how to remediate this, and we believe that we have alleged sufficiently factually at this point enough to proceed to that discovery stage to make that determination. Thank you, Counsel. You've reserved two minutes for rebuttal. Thank you, Your Honors. We'll hear from Amicus at this point. Good morning, Your Honors. I just need to set my timer here. One second. I guess I'll see you down in the corner. I have four minutes. Good morning, Counsel. Good morning, and may it please the Court. Gabriel Gillette from General & Block on behalf of the Amici, the Restaurant Law Center, the New York State Restaurant Association, and the New York City Hospitality Alliance. I want to thank the Court for permission to appear at argument today and appear remotely under the circumstances. I very much appreciate it. But I really want to answer the Court's questions focused on the cases and focused on the physical loss or damage. But before I get there, I just want to set the stage by reminding the Court about the policy interpretation principles that apply here. Those are really important, and they're New York State principles. What they say is that these are all risk policies that cover all risks of any kind unless specifically excluded, that coverage is to be construed broadly, and that undefined terms in the policies, like physical loss or damage, are given their plain and ordinary meaning. Now, what does that mean? According to New York courts, that means common speech. That means what a reasonable, ordinary business person would think the policy terms mean. It doesn't mean the gloss from an insurance treatise or from What it means is you take the terms as a reasonable business person would understand. And the last principle that I think is really important is that any reasonable interpretation supporting coverage means that the policyholder has stated a claim. Because the insurer drafts the policies, the policyholder doesn't have to come up with the best interpretation, just any reasonable one. Now, why does that matter? Let's talk about the cases. The court is correct. There are lots of cases out there that come out against the policyholders and in favor. In New York. I asked about New York because we have New York law. Okay, continue. Correct. Correct, Your Honor. So I think that those cases, I guess I have a couple of answers to them. The first is that those cases are definitely not controlling. They're from lower courts. And second, I don't think they're even constructive. And here's why. This court applies de novo review. That means you look at the issues independently. You look at them without any deference to the district court. And I think if you're not going to defer to the district court here, there's no reason to defer to district courts to other district courts. And I'd point, I guess I'd highlight a decision that came out a few weeks ago. It's an Illinois state decision, but involving a New York construction company where the judge looked at all of these decisions, including from New York and said, they don't matter here. And what he said is, quote, judges are not cheap and they don't decide. Counsel, if you were to ask a hundred business people who are operating during COVID or weren't able to operate for some period during COVID, what physical damage to your business have you suffered? Don't you think the answer would be I haven't suffered any physical damage. I've suffered loss of income, but I haven't suffered any physical damage. What would they say? I asked counsel that here, and he said, you know, it may have seeped into our, our furniture or whatever, but what would they say? Here, your honor. So I think as for the members of my clients, I think what they'd say is their physical loss or damage was blocking off access to parts of their property. It was buried. The New York, the New York case dealt with that. The roundabout case, when the street was closed and the business couldn't operate, they said, no, that's not physical damage or loss. No, your honor. In roundabout, the issue was that the, the blocked access didn't cause damage to the actual theater. The problem was offsite property damage. In our situation for, for restaurants, the property damage was on site. You're missing the point. The point is that lack of access by customers is not property damage. That's the point. Right. But I'm not saying it's just lack access, your honor. I think if you go into the restaurants on March 13th, they have a thousand square feet and it's laid out in one particular way. On March 19th, they have barriers that are literally blocking off parts of the property. It's a, some restaurants put up walls. Some took tables and chairs and in a sort of French revolution style, made it impossible for people to get through the property. Some of them took areas at the front that were, you know, previously bars. So are you arguing that this is physical loss, physical loss to the building, to the property? Yes, your honor. And I think it's important to remember that, that this case is, has to be decided on its particular facts and on the particular allegations. And this plaintiff has the theory, as many others do, that the virus itself caused physical loss. But I think it's important for the court to remember that there are lots of cases out there, including cases where courts have found a claim stated where the policyholder alleges actual physical, visible alterations to the property. And that was enough. Or they allege their property was rendered non-functional and that was enough. Or they allege the virus caused physical damage and that was enough. And I think going back to the cases, that's something that gets lost when you see the wall of cases against us. And I recognize there's a wall. There are more than cases that have come out in our favor. What is the case in which the defendant makes, or sorry, the plaintiff makes no allegation that there was physical damage to the structure and no allegation that there's any physical remediation required? Nothing, that, that all we can tell from the plaintiff's allegations is that the passage of time will eradicate what you're calling the physical damage and yet it still qualifies. Sure. I'd point your honor to the Seaford case from the District of Minnesota. I think the North State Deli case from North Carolina. I think the Cherokee Nation case out of Oklahoma. Elegant Massage, Eastern District of Virginia. All these cases stand for the proposition that a government order that makes it, that causes physical alterations on your property or that renders your property non-functional, meaning the insured property you had was a fully functional business that had assumptions baked into the premiums charged for how many seats there would be and how much space there would be and how much revenue would be generated. And after the orders came down, those assumptions change. And I think to go back to the reasonable expectations of the business owner, it's important to remember that premiums are calculated not based on just the acreage of the property and where it's located. It's based on specific assumptions about the square footage available, how it's going to be used, and the revenue that's expected. That's why a McDonald's has a different premium amount paid than, say, a three-star Michelin restaurant, even when the square footage is the same. Counsel, in conclusion, in conclusion? In conclusion, your honor, I think it's important to keep in mind that there are many cases out where policyholders have stated a claim and that the court should focus on the actual allegations and theory alleged and decide this case in favor of the policyholder. Thank you, counsel. Thank you for appearing. Thank you. And now we'll hear from Philadelphia Indemnity. Good morning. Good morning, your honor. Stephen Goldman from Philadelphia Indemnity Insurance Company. Four federal courts of appeal and one state court of appeal have issued a total of eight opinions rejecting the arguments that coronavirus causes direct physical loss of or damage to property. In New York, I think, Judge Bianco, with all respect, I think you're a little off on the number. I think we actually have dozens of several dozen decisions that have unanimously resolved these issues in favor of insurers. In fact, in our recent 28-J letter, we... Counsel, Kim Chi says that because their policy lacked the virus exclusion, their insurance premiums were higher than comparable premiums for policies that had the virus exclusion. Are they right about that? I don't believe so, your honor. I don't... And I don't believe that's adequately alleged. But would that give them a basis? It does not, your honor. It does not. In fact, in Commercial Union versus Flagship, the New York Court of Appeals specifically said that the absence of an exclusion does not create cover. But if they paid more not to have that exclusion, wouldn't they have a right based on contract law to win this lawsuit? They paid for it. They paid for the coverage, they claim. Well, they don't allege that specifically in the complaint number one, but number... That they paid more for their policy because it didn't have the virus exclusion. They bought and paid for that particular coverage. Your honor, the policy was paid for and the court's inquiry needs to be restricted to the terms of the policy under New York law, unless there's an ambiguity. Right, but they haven't had discovery. So they don't... I don't know that they have comparator insurance from other people, other similarly located businesses that have the virus exclusion, and they didn't pay to have it not in their policy. But this could be true of any insurance policy. If the court goes down that path, then there's always different policy products and some have different provisions, some have different exclusions. Of course there are. But the allegation here, and doesn't it pass muster to get beyond the dismissal, they say we paid extra not to have the virus exclusion in our policy. We paid for it, we bargained for that, and therefore under ordinary contract law, they didn't have it and they have the virus and they want to get covered. I don't believe New York law sanctions that as a cause of action. It's certainly not a breach of contract. What would New York law not sanction? I'm talking about contract law, basic common law. What would New York law not sanction? Under New York law, if the terms of the policy are clear and unambiguous, and here they've been held to be clear and unambiguous by dozens of courts and following the roundabout theater of controlling precedent, if the terms of the contract are clear and unambiguous, the court doesn't go back to look at what could have been put in the policy, that they could have bought an alternative product. But they say they made a conscious choice to pay more money not to have the virus exclusion. Well, that is not alleged in the complaint, Your Honor. And that certainly is the kind of thing if following fondly that needs to be alleged in the complaint. Well, under New York law, if the terms are plain and unambiguous, you don't look to how much they paid. You look at the words, right? Isn't that the fundamental? That's the fundamental principle. They made an argument on that that I'd like to hear your response on, which is that in looking at the words, you should consider industry practice and therefore should look at policies, other policies to see if, for example, is there an exclusion of virus exclusion, other policies in interpreting the words. What's your response to that? Again, if the terms of this policy are clear and unambiguous, which they are, then it's improper to go look at other policies. Because think of the implications of that. Every time we have a clear and unambiguous policy, the policyholder can say, well, look at these other policies that say something more specifically or more clearly. And that's simply impermissible parole under the basic parole evidence rule. If we compare this policy that she bore to an identical policy, except one that had the virus exclusion, couldn't we make it to our conclusion that they got something extra in their policy? Not necessarily. Tell me why not? Because there's all kinds. First of all, insurance companies, as noted by in the Sixth Circuit decision in Santos, the insurance policies all the time, insurance companies put another exclusion on it to make something doubly and triply and quadruply clear. That doesn't mean the first policy is ambiguous. You agree that you're bound by the terms of the policy and that if we have to interpret ambiguity, we interpret it against the issuer of the policy. You agree with those basic rules of construction, don't you? Absolutely. So, so you and Chimsey made a decision not to include the virus exclusion and they claim they paid extra not to include that. Why shouldn't they get coverage? Because you still have to look at what the policy, this policy says, not at what could have been written and whether there could have been a different language that, that there are things the virus exclusion applies to that we would agree would exclude coverage. For example, food, if food is contaminated with a neurovirus or with E. coli bacteria, that would be covered under our policy and not covered under a policy of the virus exclusion. But that's not this case. This case, we're left with what is covered under this policy as it was issued. And this virus is not, is not covered because it doesn't cause direct physical loss or damage. So I'm trying hard to understand the difference between neurovirus that closes a business because people hear about it and they don't want to get sick and COVID-19. What's the big difference? The big difference is neurovirus makes the food permanently unusable. It's destroyed. It's effectively destroyed by now and it can't be fixed. So it's a complete loss of property. There's no question about this. This is here for hours, expires by its own properties. And, and as is cited in the materials that the plaintiff attached, and you can either do nothing and it's better in a few hours or you can clean it and it's gone as soon as you clean it. But the appellant says, the appellant is saying that there's a dispute of fact about the assertions you just made. Well, the appellant hasn't pleaded any of that. And it's, it actually has attached materials to its, to its brief and to its opposition of the motion below that say, that say specifically the opposite. Page 312 of its appendix, the, the material says aerosols up to less, up to three hours and less up to two days on plastic surfaces. And then page 317 says surfaces aren't a major cause of the virus. At page 330, it talks about how long it takes for these things to expire. And there is absolutely nothing in this complaint that suggests that a virus actually physically harms the property, that it somehow changes or alters the molecular structure. So, so you're conceding perhaps, uh, you know, hypothetical way that if the plaintiff had alleged below that this is the kind of virus that persists and renders any food it edible, that might be a different case. If this, but we don't have those allegations. Well, this is a Taekwondo studio, first of all, not a restaurant. Right. So, so, uh, but if it were a restaurant and there was an allegation that, uh, a different, I don't know that coronavirus... Anybody who touches a surface that has that virus on it is at risk. No, I don't think that's sufficient to be direct physical loss or damage. The question is, what does it do to the property? What does it do to the property? Does it change the property in a way? That's the roundabout theory of the case. It has to actually damage the property. If the coronavirus, if the coronavirus got on furniture and you had to throw it out, you couldn't wipe it off the furniture. That would be an example, right? If, if, if there was a property of the coronavirus that made, unable to clean it, right? If there was a, if hypothetically the coronavirus could never be removed from the property and the property, it would therefore, anybody coming into the Taekwondo studio at any time in the indefinite future would be, would be at risk. That would, that would be a different situation because that, at that point, it becomes actual damage. But when it's, when it's, uh... Isn't there a case already pending before this court? 10012 Holdings Inc versus Sentinel Insurance, where there was argument a few months ago. Isn't that already before the court? That's before the court. That is, does not involve an allegation of a virus on a surface, but it does involve the basic question of loss of use of property, uh, caused by... The case is not distinguishable from this case. It's the same legal issue, right? It's the same legal issue. Was there a virus exclusion in that case? I'm sorry? Was there the virus exclusion in that case? There was not. There was not. But there, that, that panel is going to be interpreting the words direct physical loss of physical damage in this context, right? That's correct. Okay. But, uh, the, uh, yeah, that, that is correct. I mean, the, the only difference between this case and that case is the plaintiffs have claimed, I don't know if they have, as we argued in our brief, I don't know if they have alleged that there was a virus on the, on the Taekwondo Studios premises. And there was no such allegation in the, in the, in the other case. That's the only difference between the two cases. And we would submit that makes no difference whatsoever because, uh, because the, there's no physical damage to the property there as is, as, as has been recognized by the way. There are 18 cases in which, uh, uh, Judge Bianco's, uh, excuse me, 21 cases in which, uh, Judge Crawford's decision in the trial court here has been cited with approval by other courts. Most of them in New York, not all. Um, so the, the, and Judge Bianco, uh, Judge Crawford, excuse me, went through that exact analysis of why this is not direct physical loss or, or damage. So my 20 number was almost right. Right. So already we have 21 cases citing this case with approval. And those cases include Judge Rakoff who found that the virus on the surface of a hospital, uh, is, is not direct physical loss or damage. Uh, Judge Kodal who found the same thing. Distinguish the out-of-state courts. Stick with, stick for a second with the question of what the virus exclusion means, if anything. There is a maximum of contract interpretation in New York and elsewhere that we shouldn't, generally speaking, interpret contracts to render one or more provisions totally superfluous. Right. We should presume that the parties negotiated them and put them in there for a reason. And if a virus has to do physical damage to the property, uh, in order for anybody to get coverage for virus, viral contact, doesn't that render that, uh, provision a nullity? Because there may not be a virus that actually does physical damage to property. Well, it depends what kind of property, Your Honor. As I, as I mentioned before, I mean, uh... Well, why do you, why, why do you negotiate virus exclusions to coverage that only applies to physical loss in the first place? Why, why is that not a nullity? Like, how, how could that virus exclusion matter? There are two reasons to that, uh, that question, Judge Bianco. The, the, the first is that there are, as I mentioned before, there are certain types of property that the virus can damage. And I used, for example, food being a, not this virus, but a different virus that could damage food, could destroy it. If, if a food, food stuff that is, that is, uh, so infested with, uh, neurovirus or with E. coli, well, E. coli is a bacteria, but so, you know, that, because the, the, the exclusion also applies to bacteria. Okay, so the, the, if, if you had purchased a policy that did not exclude viral infection, you might be covered for the cost of the lost food at a restaurant. That's correct. That's correct. So it does have meaning. And the other part of the answer to your, your, your Honor's question is there is a, also a principle in it. Again, I refer the court to the Sixth Circuit's decision in, uh, in Santo's, uh, Italian, uh, restaurant that where the, the court goes through a fairly lengthy discussion of, of the fact that insurance policies, this is my term, not the court's, are, have a lot of belt and suspenders provisions to avoid just this kind of thing. There's, there's creative plaintiff's lawyers constantly trying to, to, uh, uh, develop theories of coverage, sometimes with success, sometimes not. And they want to make things doubly, triply, and quadruply clear to avoid those kinds of claims and, and, and lawsuits, even if, even though the policy provisions they had may be, may be clear and unambiguous. And in conclusion? Uh, in conclusion, Your Honor, there's nothing alleged in this complaint saying that this physically damaged in any way. The clear and unambiguous terms of New Yorker would not look at a Taekwondo studio, anyone that would look at his apartment or hospital room and say, my, uh, my property has been damaged because there was coronavirus in that. That's simply not, not, uh, the common use of the words. And finally, I refer the court to, uh, two cases. First, the Roundabout case, which is, uh, clearly controlling here, which... In conclusion, I'll stop there. And the last thing I'd just say is to refer the court to the Shard-Hardy, um, case, which is one of the many cases cited by us, because I think it contains an excellent summary of, uh, the way the New York courts have approached, uh, these issues. Thank you, Your Honor. Thank you. Mr. Berlotti, you've reserved two minutes for rebuttal. Your Honors, I'd like to address a couple of questions that the courts, uh, brought up, uh, specifically. Uh, first, Your Honor asked regarding, uh, the virus exclusion and the choice to omit it or not. And there was reference to, well, it could damage food. The problem is the virus exclusions apply to coverage A to building and real property damage as well. So it is still applicable. And so they can't get around the fact that they're issuing virus exclusions for real property damage. Additionally, the 10012 case before this court, the difference and the distinguishing factor in that case, Your Honor, is the fact that they did not allege the presence of the virus. And that renders Roundabout completely distinguishable and inapplicable to this case. The Roundabout court examined a circumstance where there was nothing wrong with the property. There was no nexus to the property. There was no damage to the property. Everything was outside and contemporaneous with the property, not actually at the property. Here, we allege the presence of the virus. This is a taekwondo studio. This is where people have to be using the property. They have to be on the property. They're rolling around on the floor of the property. When you have the presence of the virus, it renders it unsafe and unusable. That is the physical loss here. I'd also like to point out. Can't every business allege that? A restaurant could say, we have the presence of the virus. We had all these people here eating. We're sure we had the virus here, right? It's not unique to your client. It's not unique. And that's why I believe that in all circumstances, the presence of the virus does constitute direct physical loss to the property. Particularly under. I'm just saying this doesn't distinguish you from the dozens of cases that have come out the other way because I haven't come to every one of those complaints, but I'm sure you're not the first one to allege that the virus was on your property, right? Your Honor, that's correct. It doesn't distinguish us from the other cases. However, the fact that those cases did not examine this court's decision in Pan Am, this court's decision in Parks Real Estate, the PepsiCo decision, those are the items that distinguish this case from those cases and make it that this court should rule in favor of the plaintiff on this particular policy. Specifically, in regards to the roundabout case, again, I can't emphasize this enough that loss of use, that's dicta in that case because there was nothing wrong with that property. There is something wrong with the property here. There was the presence of the virus. And in regards to the question about whether damage is permanent or not, that doesn't render damage covered or not covered. That's a question of damages. Smoke damage occurs to property all the time, but you can clean it and then it's okay. You don't need to physically replace it. It's the same as cleaning a virus here. It's a question of damages. It's a question of how long was the property rendered unusable, not whether it was rendered unusable. It's directly analogous to cases where everyone understands and acknowledges that there is coverage. It's directly analogous. And so we would ask that you rule in favor of the plaintiffs here and deny the motion to dismiss. Thank you. Thank you. Thank you both. Very good argument.